# In the United States Court of Federal Claims

No. 18-200C
(Filed Under Seal:  April 27, 2018)
(Reissued for Publication:  May 8, 2018)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| NATIONAL GOVERNMENT    * | |
| SERVICES, INC.,     * | Pre-Award Bid Protest; Section 1874A of |
|    * | the Social Security Act; Medicare |
| Plaintiff,     * | Modernization Act; 42 U.S.C. § 1395kk-1; |
|    * | Standing; Full and Open Competition; |
| v.     * | Statutory Authority to Implement Policy |
|    * | Providing for Other Than Full and Open |
| THE UNITED STATES,     * | Competition; Competitive Procurement; |
|    * | Permanent Injunction |
| Defendant.     * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Anuj Vohra, Washington, DC, for plaintiff.

William Rayel, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

       In this pre-award bid protest, plaintiff National Government Services, Inc. ("NGS") challenges the terms of two solicitations issued by the Centers for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services. NGS alleges that CMS established a Contract Award Limitations policy with respect to Medicare Administrative Contractor ("MAC") procurements without the statutory authority to do so and that, in any event, the policy itself is arbitrary and capricious. Currently before the court are the parties' cross-motions for judgment on the administrative record and defendant's motion to dismiss, in part, NGS's protest. As explained below, although NGS has standing to pursue its protest, it has not succeeded on the merits because the Contract Award Limitations policy is neither contrary to law nor lacking a rational basis. Therefore, the court denies defendant's motion to dismiss, denies NGS's motion for judgment on the administrative record, and grants defendant's cross-motion for judgment on the administrative record.

---

       * The court issued this Opinion and Order under seal on April 27, 2018, and directed the parties to submit proposed redactions. This reissued Opinion and Order incorporates the redactions proposed by the parties. All redactions are indicated by a bracketed ellipsis ("[. . .]").

# I. BACKGROUND

Congress established Medicare in 1965 by amending the Social Security Act.  See generally Social Security Amendments of 1965, Pub. L. No. 89-87, 79 Stat. 286.  CMS has used contractors to administer Medicare claims and benefits since the beginning of Medicare's existence.  Administrative R. ("AR") 4374, 5378.  For Medicare's first four decades, these services were procured via noncompetitive contracts that were renewable annually.  Id. at 5378.  Then, in 2003, Congress amended the Social Security Act—adding Section 1874A to title XVIII—to create the MAC program.  Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Modernization Act"), Pub. L. No. 108-173, § 911(a)(1), 117 Stat. 2066, 2378-83 (codified as amended at 42 U.S.C. § 1395kk-1).  The MAC program incorporates the Federal Acquisition Regulation ("FAR") to the extent that the FAR does not conflict with a specific Medicare requirement.  42 U.S.C. § 1395kk-1(a)(6) (2012).  The FAR, in turn, implements the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301 (2012), and requires "full and open competition through use of the competitive procedure(s) . . . that are best suited to the circumstances of the contract action."  FAR 6.101(b).  Beginning October 1, 2005, CMS was required to use competitive procedures for new procurements as previous contracts expired, with the transition to "competitive bidding of all contracts for [MAC] functions" to be complete by October 1, 2011.[1]  Medicare Modernization Act, § 911(d), 117 Stat. at 2385.  CMS has awarded "more than two dozen" MAC contracts since 2005.  AR 5378.

MACs "provide specified [Medicare] benefit administration services, including Medicare claims processing and payment services."  Id. at 10, 5415.  An "A/B" MAC provides such services with respect to Medicare Parts A and B.  Id. at 64, 5475; 42 U.S.C. § 1395kk-1(a)(4); see also 42 U.S.C. §§ 1395h(a), 1395u(a) (providing that administrative services for Medicare Parts A and B, respectively, "shall be" provided via MAC procurements under 42 U.S.C. § 1395kk-1); AR 157-58 (describing the services covered under Medicare Parts A and B), 5568-69 (same).

---

[1]  Section 1874A of title XVIII of the Social Security Act, which is codified at 42 U.S.C. § 1395kk-1, provides that the Secretary of the United States Department of Health and Human Services is responsible for overseeing the MAC program.  The functions in title XVIII of the Social Security Act were delegated to CMS (formerly known as the Health Care Financing Administration) in Section F.30.E of CMS's Statement of Organization, Functions, and Delegations of Authority.  Centers for Medicare & Medicaid Services, 66 Fed. Reg. 35437-03, 35437 (July 5, 2001); Statement of Organization, Functions, and Delegations of Authority, 49 Fed. Reg. 35247-01, 35248 (Sept. 6, 1984).  Section F.30 has been updated twice since the enactment of the Medicare Modernization Act, but neither update concerned Section F.30.E.  See Delegation of Authority, 76 Fed. Reg. 13618-01, 13619 (Mar. 14, 2011); Statement of Organization, Functions, and Delegations of Authority, 74 Fed. Reg. 38663-01, 38663 (Aug. 4, 2009).

The A/B MAC program is divided into geographic jurisdictions for the purpose of contract administration:[2]

| Current A/B MAC Jurisdiction[3] | States and Territories Included |
|---|---|
| Jurisdiction E | American Samoa, California, Guam, Hawaii, Nevada, Northern Mariana Islands |
| Jurisdiction F | Alaska, Arizona, Idaho, Montana, North Dakota, Oregon, South Dakota, Utah, Washington, Wyoming |
| Jurisdiction 5 | Iowa, Kansas, Missouri, Nebraska |
| Jurisdiction 6 | Illinois, Minnesota, Wisconsin |
| Jurisdiction H | Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, Texas |
| Jurisdiction 8 | Indiana, Michigan |
| Jurisdiction 15 | Kentucky, Ohio |
| Jurisdiction J | Alabama, Georgia, Tennessee |
| Jurisdiction K | Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, Vermont |
| Jurisdiction L | Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania |
| Jurisdiction M | North Carolina, South Carolina, Virginia, West Virginia |
| Jurisdiction N | Florida, Puerto Rico, U.S. Virgin Islands |

AR 4491-92, 5548.  Nearly 72% of the approximately 52 million people enrolled in Medicare participate in the traditional Medicare program, which includes Parts A and B, rather than the Medicare Advantage program.  Id. at 5568.  The MACs collectively process over 1.2 billion Medicare claims and disburse nearly $367 billion in Medicare payments annually.  Id. at 6492.

### A. CMS Implements the Medicare Modernization Act

CMS partnered with LMI Government Consulting ("LMI") to "ensure the full and successful implementation of the [Medicare Modernization Act]."  AR 4375.  Specifically, CMS

---

[2]  There were fifteen MAC jurisdictions when CMS began awarding MAC contracts using competitive procedures, several of which have been consolidated and renamed.  AR 1462, 1485.  The jurisdictions are subject to reconfiguration "[a]s CMS re-competes the A/B MAC contracts."  Id. at 1461.

[3]  The jurisdictions are often referred to via shorthand such as "J8" for Jurisdiction 8 and "JH" for Jurisdiction H.  See, e.g., AR 5377, 6492.

asked LMI to "advis[e] and assist[] CMS with the development of increasingly detailed strategies and plans, research, acquisition support, and the development of workload transition materials." Id.  In May 2004, LMI issued a report analyzing the tradeoff between the "additional benefits of economies of scale" with fewer MACs and the possibility that "too few contractors may stifle subsequent competition and increase the operational impact associated with failure of one of them." Id. at 4376.  LMI observed that having too few contractors could lead to one or more contractors "obtain[ing] too much market power" and that "[t]he larger the market share a contractor has, the larger the impact contractor failure will have on beneficiaries and providers and the harder it will be for CMS to recover from such failure." Id. at 4377.

LMI utilized the Herfindahl-Hirschman Index in studying the number of MAC contracts that a contractor should be permitted to hold. Id. at 4380.  The Herfindahl-Hirschman Index is used by the United States Department of Justice ("DOJ") in "evaluating consolidations associated with mergers and acquisitions" with the goal of "prevent[ing] proposed mergers and acquisitions that increase concentration and thereby adversely affect competition." Id.  As the hypothetical postmerger index increases, the competitive impact of the proposed merger is more closely evaluated and will eventually "result in a challenge based on market concentration concerns." Id. at 4381.  LMI indicated that limiting the number of contract awards would allow CMS to "achieve the benefits of consolidation, while maintaining a competitive environment." Id. at 4390.  LMI concluded that, to stay within DOJ guidelines, "CMS should limit the number of awards to any one contractor to no more than two," and observed that allowing contractors to win three awards could result in an automatic "challenge" situation. Id. at 4383.  However, LMI noted that CMS "could still remain within the DOJ guidelines while permitting a more complicated version of the limit that permits some prime contractors to win as many as three regions." Id.

Accordingly, in November 2004, the CMS Medicare Contractor Management Group observed:

> Concentration of Workload:  If an entity were to maintain an excessive share of the [MAC] workload (i.e., over 25 percent) and a business or operational failure were to occur, then CMS could experience disruption in the delivery of services to providers and beneficiaries (i.e., claims payment).
>
> Limitation of Competition:  Limitations of any degree may cause CMS to miss the opportunity of reviewing all potential candidates, including strong offerors that may be beneficial to the program. However, a trade-off exists between numbers of contractors in the program (concentration of the workload) and elimination of qualified potential offerors that CMS must examine.

Id. at 4406-07 (footnotes omitted).  The group recommended an "'up-front cap' option, which allows offerors to bid on an unlimited number of jurisdictions, but restricts the award once a contractor strikes the limit." Id. at 4408.  The group explained:

> By informing the contractor community of any limitations at the
> start of the MAC implementation, it allows the offerors to
> strategize and utilize their finances and resources in an effective
> manner.  This option best mitigates the possibility of one
> contractor obtaining a high concentration of the Medicare
> workload.  Although this option does expose CMS to the risk
> associated with limited competition . . . , the agency could mitigate
> this risk through the establishment of a cap that is not too
> restrictive (i.e., a workload ceiling of 25 percent).

Id.

However, the group's recommendation was not initially adopted.  In the first round of
solicitations, CMS instead adopted a case-by-case approach in its solicitations:

> Offerors who propose on more than one jurisdiction will be
> evaluated individually on each jurisdiction.  If, after evaluation of
> each jurisdiction under this solicitation an offeror is the potential
> winner for more than one jurisdiction, CMS will assess the
> associated risks with awarding one contractor multiple
> jurisdictions.

Id. at 1819 (containing an excerpt of Solicitation No. RFP-CMS-2006-0033, which was issued
on September 7, 2006).

## B.  CMS Refines Its Contract Award Limitations Policy

In 2010, CMS began to prepare for the "Round II" competitions—competitions to replace
the original A/B MAC contracts upon their expiration.  Id. at 1823.  On July 22, 2010, prior to
the first Round II solicitation, CMS issued a Request for Information ("RFI") to "describe three
A/B MAC program strategy elements that will shape CMS's approach to the A/B MAC Round II
procurements" and to provide "an opportunity for potential offerors to provide their perspectives
to CMS on the issues addressed in [the RFI] and other issues relevant to the re-competition of the
A/B MAC contracts."  Id. at 1462.  The CMS strategy elements included consolidating the A/B
MAC jurisdictions from fifteen to ten "in a phased process that will take several years to
complete" and, as relevant here, implementing "an award limit for the A/B MAC contracts, to be
included in all A/B MAC solicitations" beginning with the first Round II solicitation to be issued
later that year.  Id.

In the July 22, 2010 RFI, CMS explained that it "intend[ed] to place a limit, in all A/B
MAC Round II solicitations, on the amount of A/B MAC contract responsibility that any single
entity can win . . . in a 'prime contractor' capacity."  Id. at 1465.  CMS further explained that its
objectives were to minimize "program risk" while "maintain[ing] a healthy level of competition
for the A/B MAC contracts," and that it planned to meet those objectives by setting the "prime

contract award limitation at 26% of the national A/B MAC workload." Id. at 1465-66 (emphasis omitted).  The contract award limitation would be applied in the following manner:

> [I]f a given new A/B MAC prime contract award, added to the entity's existing A/B MAC prime contracts, would exceed this 26% threshold, then CMS would not award the new A/B MAC prime contract to the entity.  Effectively, this limitation means that CMS would not award an additional A/B MAC prime contract to any entity that has already been awarded prime contract responsibility for two of the larger Round II A/B MAC contracts, or some combination of three of the smaller Round II A/B MAC contracts. . . .

> CMS believes that the above approach to an A/B MAC contract award limitation, that is, a limitation that is framed around prime contract responsibilities, is administratively feasible and appropriate.

Id. at 1466.  CMS posed several questions to potential offerors, including:

> What issues, if any, does the prime contract award limitation of 26% of total Part A and Part B claims volume present to your organization as it strategizes for the next round of A/B MAC procurements?  If a simple prime contract award limitation is not the best approach to implementing a contract award limitation, please explain why and provide concrete suggestions for how CMS could develop and implement a sounder approach.

Id. at 1468.

In response to the RFI, several prospective offerors asked questions with respect to how CMS would apply the contract award limitation.  See id. at 1774.  The respondents generally supported a limitation and advocated for applying the limitation on a prime contractor level to entire affiliated groups:

- "[W]e strongly support a simple contract award limitation applied at a whole company level . . . ."

- "The 26% total Part A and Part B prime contract award constraint will still enable [respondent] to serve more than twice its current . . . workload.  This is well within [respondent's] growth capabilities."

- "[T]he 26% limitation should apply to all Medicare business of a single corporation, including all separately formed entities

and all subcontracts and other teaming arrangements, to
include the entire 'book of Medicare business.' Any corporate
organization that has more than 26% of the national Medicare
workload will stifle future competitions because of its ability to
first submit bids at a lower administrative cost and then
because of the monopolistic [e]ffect that will create."

Id. at 1777-78.  In fact, seven out of ten respondents—including NGS—specified that CMS
should "[a]pply the limitation cap at the enterprise level, including the parent company and all
subsidiaries and affiliates" and/or "to all affiliates within a corporate entity or joint venture." Id.
at 1780.  None indicated that a higher cap should apply to affiliated groups.  Id.  Only one
respondent—NGS—expressed "concern[] that establishing a prime contract award limit at 26%
of the national A/B MAC workload will limit competition."  Id.

After reviewing the responses, CMS examined three options, along with their
concomitant benefits and drawbacks, for implementing a contract award limitations policy:

- Option 1:  Continue with case-by-case approach.

    o Pros:  No artificial limitation criteria to lessen the spirit
      of a full-and-open competition.

    o Cons:  Increased post-award bid protests if relevant
      factors not identified.

- Option 2:  Impose a contract award limitation on the prime
  contractor only.

    o Pros:  Ease of administration.

    o Cons:  Easy to "game" by creating subsidiaries or
      accepting significant subcontractor roles with other
      entities.

- Option 3:  Prorate claims volume to prime contractors and
  major subcontractors based on dollar amount of contract.

    o Pros:  More nuanced limitation may limit "gaming" the
      system.

    o Cons:  Administratively burdensome.

Id. at 2098.  In other words, CMS was concerned with whether it was "better to have a simple
policy that [was] administrable, a more nuanced policy that may carry some administrative
burdens[,] or no policy at all" that may be harder to justify in a post-award bid protest.  Id.  CMS

was also concerned with how to treat affiliates, i.e., (1) whether it should consider affiliates "as one entity when determining limitations" and (2) the "danger in creating a policy that may be applicable to a single potential offeror." Id.  CMS discussed these issues in multiple meetings. See, e.g., id. at 2068 (referencing, on July 26, 2010, a draft policy), 2072 (referencing a July 29, 2010 meeting), 2074 (referencing an August 2, 2010 meeting), 2097-99 (referencing both an August 4, 2010 meeting and a planned follow-up meeting), 2100-01 (providing a summary of the discussion during an August 9, 2010 meeting), 2144 (referencing an August 17, 2010 meeting), 2174 (referencing an August 23, 2010 meeting).

On August 24, 2010, CMS issued another RFI.  Id. at 1472.  In its revised proposed Contract Award Limitations policy, CMS explained that it would

> not award more than 26.0% of the national Medicare workload, in A/B MAC prime contracts and significant subcontracts, to any single contractor (single corporate entity).  In addition, CMS will not award more than 40.0% of the national Medicare workload, in A/B MAC prime contracts and significant subcontracts, to any one set of affiliates.

Id. at 1475.  CMS declared that the purpose of the proposed policy was to "manage program risk," and noted that it had considered the "detailed information" provided in comments received in response to its prior RFI.  Id. at 1474.  CMS then outlined the application of its proposed policy as follows:

> To compute the base A/B Medicare workload of a single contractor (or set of affiliates), CMS will identify the A/B MAC prime contracts and significant subcontracts held by the given contractor (or set of affiliates) and will identify the associated Medicare workloads . . . .  Workloads being performed under significant subcontract[s] . . . will be attributed to the given contractor.

> If, at the point in time at which CMS is making a given A/B MAC contract award determination, CMS determines that awarding the given A/B MAC contract to the apparent successful offeror will, when coupled with the base A/B Medicare workload of the offeror (including the Medicare workload of any affiliates and including significant subcontracts held by the contractor or its affiliates), cause the contract award limitation to be exceeded, CMS will award the A/B MAC contract to the offeror whose proposal has been judged by CMS to be the second most advantageous proposal to the government.  (If the second offeror also implicates this policy, then CMS will award to the third-in-line offeror.)

> CMS holds the discretion to award a given A/B MAC
> contract to a given contractor, even if doing so will otherwise
> exceed the A/B MAC contract Medicare workload allowed by this
> policy, in the event that, for the given A/B MAC solicitation, there
> are no other responsible prospective contractors.

Id. at 1475.  "Affiliate" was defined by reference to FAR 2.101.  Id. at 1474.  "Significant subcontractor" was defined as a subcontractor that would perform at least 10% of the dollar value, per the final proposal, of a particular A/B MAC contract.  Id. at 1475.  The proposed policy also included (1) provisions addressing changes in subcontractors, teaming arrangements, and acquisitions and divestitures, see id. at 1476; (2) the relative sizes of the then-current and proposed consolidated jurisdictions, see id. at 1478-80; and (3) examples of how CMS would apply the proposed Contract Award Limitations policy, see id. at 1481-82.  Further, CMS indicated that the policy would be included in the text of all Round II solicitations for MAC contracts.  Id. at 1478.

In response to the August 24, 2010 RFI, multiple contractors made comments and posed questions regarding how the contract award limitations cap would be applied, application of the "affiliate" definition, and subcontractor issues.  Id. at 1784.  With respect to the contract award limitations themselves, the following comments are relevant:

- "[T]wo subsidiaries of a parent company can hold 40% of the national workload[.]  We believe this percentage is high and that CMS should hold any[ ]one set of affiliates to the same percentage as the other non-affiliated entities, 26%.  Allowing any one 'set of affiliates' [to accrue] a higher percentage is counter to the intent of the limitation, which is to manage risk and ensure competition."

- "The 26% of workload limitation for an individual contractor is reasonable.  This would allow an individual contractor to administer at least two A/B MAC jurisdictions.  Two A/B MAC jurisdictions allow contractors to possess the expertise and scale of operation to provide high quality and cost effective services within very manageable risk levels.  The 26% cap also provides a sufficient number of MAC contractors to ensure ongoing market competiveness."

- "We recommend the affiliated entity award limitation to be set at 50% (sum of the four largest A/B MAC jurisdiction percentages of national workload) of the national workload versus 40%.  The primary problem with a 40% of workload cap is that it could limit a set of even two affiliated contractors to three A/B MAC jurisdictions.  This would mean that at least one of the affiliated A/B MAC contracting entities would be

limited to a single A/B MAC jurisdiction.  It is questionable how long a contracting entity holding only one A/B MAC jurisdiction will be competitively viable."

- "CMS should reserve the discretion not to impose cap(s) where it is exceeded by an immaterial amount.  It would not be in the best interest of the Medicare Program for an award not to be made to a given Contractor with a higher value proposal simply because the award might give the contractor 26.4% of national workload or the contractor and its affiliates 40.6% of national workload."

Id. at 1787-88.

After reviewing the industry responses, CMS decided to remove references to subcontracts from its Contract Award Limitations policy.  Id. at 4003, 4190-91.  The Contract Award Limitations policy was then included in Section M.2.b of the Jurisdiction F solicitation that was issued in October 2010:

> CMS will not award more than 26.0% of the national A/B Medicare workload, in A/B MAC prime contracts, to any single contractor (single corporate entity).  In addition, CMS will not award more than 40.0% of the national A/B Medicare workload, in A/B MAC prime contracts, to any one set of affiliates.

> CMS is placing no limitation on the number of A/B MAC prime contracts for which any entity, or entities, may submit proposals.  As A/B MAC prime contracts are awarded, the awardee's Medicare workload base will be appropriately adjusted . . . .

> . . . .

> CMS will determine whether or not offerors exceed the limitation on workload at the time of award, and will exclude offerors from consideration on such basis at this time.

> . . . .

> In order to ensure continuity in Medicare fee-for-service operations, CMS holds the discretion to award a given A/B MAC prime contract to a given contractor, even if doing so will otherwise exceed the A/B MAC prime contract Medicare workload allowed by this policy.

Id. at 4174-77.   In questions posed by potential offerors during the solicitation period, CMS confirmed that "the contract award limit . . . pertains only to A/B MAC prime contracts and A/B MAC prime contractors," and that "[t]he provisions of the solicitation supersede prior A/B MAC contract award limit options that were discussed in two [RFIs] published during July and August, 2010." Id. at 4220.

In August 2014, CMS issued Solicitation No. HHSM-500-2014-RFP-0071 to procure a MAC for Jurisdiction M.  On October 2, 2014, CMS posted answers to questions that it received from an amendment to that solicitation.  Relevant here is the following:

> Question
>
> This section reads "In order to ensure continuity in Medicare fee-for-service operations, CMS holds the discretion to award a given A/B MAC prime contract to a given contractor, even if doing so will otherwise exceed the A/B MAC prime contract Medicare workload allowed by this policy."  How does CMS define "continuity in Medicare fee-for-service operations"?
>
> Answer/Action
>
> The title for this section is "Exception."  In other words, CMS will apply the A/B MAC prime contract award limit to the Jurisdiction M contract award, unless CMS encounters circumstances that fall within the scope of the exception.  For instance, the exception could be triggered if only one offeror were to respond to the [Request for Proposal ("RFP")], and that single offeror would otherwise not qualify for an additional A/B MAC prime contract award under the policy.  Similarly, the exception could apply if there were multiple offerors, but CMS found them all (save for one) to be non-responsible.

Id. at 4860.

On September 1, 2015, after CMS was given statutory authority to extend MAC contract terms from five to ten years, id. at 1501, CMS posted an RFI seeking feedback with respect to, among other issues, whether its Contract Award Limitations policy was still "appropriate in a 10-year contract term environment," id. at 1504.  Four MACs expressed support for CMS's continued use of the Contract Award Limitations policy:

- "[T]he limits are valid . . . .  We do not believe the A/B limits should be exceeded." Id. at 4867.

- "[G]iven the small number of current experienced MAC companies, lifting the award limits may further reduce MAC

competitiveness and be a further barrier to non-incumbent companies trying to enter MAC contracting. . . . [T]he award limits provide CMS with an appropriate risk limit. CMS currently has the ability to waive the limits if it is in the best interest of the Government. We see no need to define [circumstances in which the award limits should be waived] further in the RFP." Id. at 4934.

• "If the award limits were removed the number of contractors would be reduced. Fewer contractors means competition will be reduced with the potential for increased costs . . . and added risk for CMS from having a smaller pool of contractors. Without the limits in place, the risks are that one entity could become 'too big to fail' while for other, smaller contractors, without the potential for a certain amount of the workload entities might decide to exit the program. The costs of entry into MAC contracting are so high that new competition is very unlikely to emerge. . . . CMS currently states that it will consider waiving the award limits '[i]n order to ensure continuity in Medicare fee-for-service operations.' At this time, we do not envision any other circumstances that would justify waiving the award limits." Id. at 4948.

• "[The contract award limits] are relatively generous and necessary to promote competition. Additionally, there needs to be a reasonable base over which to share best practices and not get boxed into the ideas of one or two corporations. . . . [T]he 10-year contract term, coupled with higher caps, may permanently shrink the base. It is unlikely someone could get back in after a 10-year absence. . . . [T]he criteria should only be waived in extreme circumstances . . . ." Id. at 4960-61.

A fifth MAC expressed support for using award limits, but suggested that the limits as constituted were less than optimal. Id. at 4972-73. The same MAC posited that "a greater balance of workloads" among the jurisdictions would "allow[] the MACs to be on equal footing to bring innovation and process improvements to the administration of Medicare . . . , providing for greater competition." Id. at 4972. Meanwhile, NGS advocated for a return to the former case-by-case approach, declaring that "CMS should evaluate each contract separately from a business and delivery risk" perspective. Id. at 4922. NGS remarked that "CMS should consider removing the award limits for all MAC contracts" because, although "[t]he limits served their purpose at the time, . . . their utility and value going forward are questionable." Id.

On August 5, 2016, CMS posted an RFI to "obtain advance industry and public feedback on the clarity and efficacy of . . . draft RFP changes in advance of future MAC procurements." Id. at 1512. Specifically, CMS sought "public comment on the proposed updates to the MAC

procurement schedule, the revised draft RFP, [CMS's] value engineering proposal, and the attachments provided [as part of the RFI]." Id. CMS included its Contract Award Limitations policy at Section M.10 of the draft RFP. Id. at 1643-46. Except for nonsubstantive typographical changes, the policy was the same as the policy set forth in the Jurisdiction F solicitation that was issued in October 2010. Compare id., with id. at 4174-77.

On October 5, 2016, CMS issued a report summarizing the responses to the August 5, 2016 RFI. See generally id. at 5315-74. Some of the respondents expressed concern regarding, or outright opposition to, the Contract Award Limitations policy. One respondent did not explicitly object to the policy, but asked how the higher limit for affiliated groups would "prevent teaming arrangements among different MACs." Id. at 5315. Another respondent indicated that the higher cap for affiliates "creates an inequitable outcome" because sets of affiliates "have an inherent competitive advantage by being able to obtain a larger share of the Medicare workload," while acknowledging that it "appreciate[d] and support[ed] that award limits will remain as part of the procurement process" and that "CMS is best served by . . . the maintenance of a competitive marketplace with several companies involved." Id. at 5322. Meanwhile, a third respondent and NGS both advocated for eliminating the caps altogether. Id. at 5321. However, the vast majority of the comments and questions concerned other areas of the draft RFP that was contained within the RFI. See id. at 5321-63. Moreover, other respondents "encouraged CMS to maintain its existing award limit criteria to . . . prevent further reductions in the number of companies capable of performing MAC work." Id. at 5384. CMS determined that although there was the possibility of "strengthened administrative oversight . . . by potentially reducing the number of individual companies with contracts, it [was] nevertheless critical to maintain a robust pool of competition to ensure the long-term viability of companies performing MAC activities." Id.

On March 30, 2017, CMS posted Solicitation No. RFP-500-2017-005 to procure a MAC for Jurisdiction F.[4] Def.'s Partial Mot. Dismiss, Cross-Mot. J. Administrative R., & Resp. Pl.'s Mot. J. Administrative R. ("Def.'s Cross-Mot.") App. 1 (Hazelwood Decl. ¶¶ 1-2). [. . .], including NGS, timely submitted proposals for that procurement by the June 1, 2017 deadline for doing so. Id. [. . .]. Id.; AR 4492-93. As of March 29, 2018, CMS had not completed its initial evaluation of the proposals, established a competitive range, or made an award decision. Def.'s Cross-Mot. App. 2 (Hazelwood Decl. ¶ 3).

### C. CMS Issues the Solicitation for A/B MAC Jurisdiction 8

On September 15, 2017, CMS issued Solicitation No. HHSM-500-2017-RFP-0016 to procure a MAC for Jurisdiction 8 for a base year and up to six option years.[5] Id. at 4, 10, 18,

---

[4] A challenge to the Jurisdiction F solicitation is not before the court.

[5] The Jurisdiction 8 solicitation was posted on FedBizOpps.gov under Solicitation No. RFP-500-2017-0016. AR 1439. Although CMS used both HHSM-500-2017-RFP-0016 and RFP-500-2017-0016 to identify the solicitation, offerors were directed to use HHSM-500-2017-RFP-0016. Id.

5375; see also id. at 5377-78 (listing the duties of the eventual awardee). The due date for proposals was November 15, 2017. Id. at 98. The anticipated award date is July 30, 2018, with a contract effective date of August 1, 2018. Id. at 1365. The Jurisdiction 8 solicitation contained, in Section M.10, the Contract Award Limitations policy that is at issue in this protest:

> CMS will not award more than 26% of the national A/B Medicare workload, in A/B MAC prime contracts, to any single contractor (single corporate entity). In addition, CMS will not award more than 40% of the national A/B Medicare workload, in A/B MAC prime contracts, to any one (1) set of affiliates.

> CMS is placing no limitation on the number of A/B MAC prime contracts for which any entity, or entities, may submit proposals. As A/B MAC prime contracts are awarded, the awardee's Medicare workload base will be appropriately adjusted . . . .

> . . . .

> CMS will determine whether Offerors exceed the limitation on workload at the time of award, and will exclude Offerors from consideration on such basis at that time.

> . . . .

> In order to ensure continuity in Medicare Fee-for-Service operations, CMS retains the discretion to award a particular A/B MAC prime contract to a particular contractor, even where doing so would otherwise exceed the A/B MAC prime contract Medicare workload allowed by this policy.

Id. at 133-35. "Affiliates" were defined by reference to FAR 9.403.[6] Id. at 133. Each offeror was required to

- identify both its immediate owner, if any, and highest-level owner, id. at 85 (incorporating FAR 52.204-17, Ownership or Control of Offeror, into the solicitation);

---

[6] Section H.23 of the solicitation (which is not at issue in this protest) refers to FAR 2.101 for the definition of "affiliates." AR 64. However, the distinction is irrelevant because these two definitions are functionally equivalent. Compare FAR 2.101 (referenced in Section H.23 of the solicitation), with FAR 9.403 (referenced in Section M.10, which contains the Contract Award Limitations policy).

- submit charts depicting the offeror's

  - "current internal structure and the relationships between the parent company and any subsidiaries and/or

    affiliates," and a similar chart for each significant subcontractor, id. at 104; and

  - "organizational alignment with its teaming partners and/or subcontractors and their respective responsibilities," id. at 113; and

- "unconditionally attest that it has experience working on contracts similar in size and scope to the [A/B MAC] contracts either solely through the offeror's (as prime) experience, or through the collective experience of the offeror (as Prime) and its subcontractor(s)," id. at 1337.

In addition, the Jurisdiction 8 solicitation incorporated FAR 52.237-3, Continuity of Services, id. at 69; required a workload closeout plan, id. at 170-71; and contained a table outlining the percentage of the national A/B MAC workload for each jurisdiction and estimated release dates for the next round of solicitations:

| Jurisdiction | Workload Percentage[7] | Next Solicitation Release Date |
|---|---|---|
| Jurisdiction E | 9.1% | 05/31/2019 |
| Jurisdiction F | 6.2% | TBD |
| Jurisdiction 5 | 5.6% | 08/01/2018 |
| Jurisdiction 6 | 7.8% | 01/02/2019 |
| Jurisdiction H | 13.5% | 03/01/2018 |
| Jurisdiction 8 | 5.9% | TBD |
| Jurisdiction 15 | 5.4% | 04/01/2022 |
| Jurisdiction J | 7.0% | TBD |
| Jurisdiction K | 12.0% | 09/01/2020 |
| Jurisdiction L | 11.0% | 04/01/2020 |
| Jurisdiction M | 9.1% | 06/01/2021 |
| Jurisdiction N | 7.5% | 02/01/2021 |

Id. at 135-36.  As of October 31, 2017, the contractors for each jurisdiction were listed on the CMS website as follows:

---

[7] The percentages sum to 100.1% due to rounding.  AR 136.

| Jurisdiction | Contractor |
|---|---|
| Jurisdiction E | Noridian Heathcare Solutions, LLC ("Noridian") |
| Jurisdiction F | Noridian |
| Jurisdiction 5 | Wisconsin Physicians Insurance Corporation ("WPS") |
| Jurisdiction 6 | NGS |
| Jurisdiction H | Novitas Solutions, Inc. ("Novitas") |
| Jurisdiction 8 | WPS |
| Jurisdiction 15 | CGS Administrators, LLC ("CGS") |
| Jurisdiction J | Palmetto GBA, LLC ("Palmetto") |
| Jurisdiction K | NGS |
| Jurisdiction L | Novitas |
| Jurisdiction M | Palmetto |
| Jurisdiction N | First Coast Service Options, Inc. ("First Coast") |

Id. at 4492-93.  Novitas and First Coast are held by a common parent, Guidewell Source, and are thus affiliated entities.  Id. at 4493.  Similarly, CGS and Palmetto are held by a common parent, the Celerian Group of BlueCross BlueShield of South Carolina.  Id.  Accordingly, the national A/B MAC workload was allocated as follows:

- Guidewell Source:  32.0%
  - Novitas:  24.5%
  - First Coast:  7.5%

- Celerian Group:  21.5%
  - Palmetto:  16.1%
  - CGS:  5.4%

- NGS:  19.8%

- Noridian:  15.3%

- WPS:  11.5%, including 5.9% for Jurisdiction 8

NGS timely submitted a proposal in response to the Jurisdiction 8 solicitation.  Id. at 1799.

### D. NGS Seeks Rescission of the Contract Award Limitations Policy

Meanwhile, on September 29, 2017, NGS contacted CMS to request a rescission of the Contract Award Limitations policy or the application of the 40% cap to individual and affiliated entities alike, or, in the alternative, to allow NGS to novate one or more of its current MAC contracts to its affiliate, NGS Federal.  See generally id. at 1789-93.  NGS contended:

> The Policy's caps exceed the statutory authority granted to CMS by the [Medicare Modernization Act] and force CMS to award MAC contracts to companies that do not provide the best value to the agency. Moreover, the difference between workload caps for single entities and sets of affiliated entities . . . does not advance CMS'[s] stated policy goals. Companies like NGS should not be at a disadvantage simply because they have been awarded contracts in the past, nor should they be at a disadvantage because they do not have affiliated entities competing for the same work.

Id. at 1792-93. NGS followed up via electronic mail on November 6, 2017. Id. at 1794.

The contracting officer for CMS responded to NGS on November 9, 2017. See generally id. at 1794-95. She explained that the solicitation did not limit the ability of any contractor to submit proposals, and that NGS could be awarded the Jurisdiction 8 contract because, if it was awarded the contract, NGS would have a total workload of 25.7%—the sum of its 19.8% workload and the 5.9% workload for Jurisdiction 8. Id. at 1794. She also provided guidance on the process for novating a contract. Id. at 1794-95.

NGS replied the next day, November 10, 2017, via electronic mail. Id. at 1796. NGS asserted that, notwithstanding the fact that it could win the Jurisdiction 8 contract, its concerns regarding the Contract Award Limitations policy were relevant because it (1) was concurrently competing for the Jurisdiction F contract and (2) could not win both the Jurisdiction 8 and Jurisdiction F contracts since its workload would then total 31.9% of the national workload. Id. Further, NGS highlighted the disparity between itself and Guidewell Source (which could still win the contract despite already holding 32.0% of the workload because of the 40% cap that applies to affiliated entities), posited that the ability to submit proposals was meaningless if it would be precluded from being awarded a contract, and indicated its intent to file a pre-award bid protest challenging the Contract Award Limitations policy. Id.

### E. CMS Issues the Solicitation for A/B MAC Jurisdiction H

On March 1, 2018, CMS issued Solicitation No. 75FCMC18R0005 to procure a MAC for Jurisdiction H for a base year and up to six option years. Id. at 5409, 5415, 5423. The due date for proposals is May 1, 2018. Id. at 5409. Except for a few nonsubstantive typographical changes, Section M.9 of the Jurisdiction H solicitation contains the same Contract Award Limitations policy and MAC workload distributions as was contained in the Jurisdiction 8 solicitation. Compare id. at 5546-48 (Contract Award Limitations policy for Jurisdiction H), with id. at 133-36 (Contract Award Limitations policy for Jurisdiction 8). Similarly, requirements for each offeror to describe its ownership, submit various organizational charts, attest to its experience, and provide a workload closeout plan are also included in the Jurisdiction H solicitation, as is the incorporation by reference of FAR 52.237-3. Id. at 5481, 5495, 5513, 5522-23, 5582, 6447.

### F.  Procedural History

NGS filed a pre-award bid protest at the Government Accountability Office ("GAO") on November 14, 2017—the day prior to the proposal submission deadline for the Jurisdiction 8 solicitation.  See generally id. at 4487-510.  In its GAO protest, NGS generally argued that the Contract Award Limitations policy should be removed from the solicitation because (1) CMS lacks the statutory authority to limit "fair and open competition" by implementing the policy and (2) the policy arbitrarily draws an unfair distinction between single entities and affiliated groups.  Id. at 4489.  The GAO denied the protest on January 29, 2018.  Id. at 4781.  In denying the protest, the GAO explained that "CMS has reasonably established a legitimate basis for the solicitation's contract award limitation provision."  Id. at 4784.

NGS then filed suit in this court on February 8, 2018, protesting the propriety of the Contract Award Limitations policy included in the Jurisdiction 8 solicitation on the same grounds as in the GAO protest, i.e., that CMS lacks the statutory authority to implement the policy and that the policy itself is arbitrary and capricious; NGS does not contend that the policy, as written, has been misapplied.  In a February 9, 2018 scheduling order, the court noted that preliminary injunctive relief was unnecessary because this protest would be resolved prior to the anticipated award date.  On March 15, 2018, NGS (with leave of court and defendant's consent) amended its complaint to include a challenge to the Contract Award Limitations policy contained within the Jurisdiction H solicitation.  The parties then filed cross-motions for judgment on the administrative record, and defendant moved to dismiss NGS's challenges to the Jurisdiction 8 solicitation and to the Contract Award Limitations policy generally for lack of standing.  The court heard argument on April 26, 2018.  The parties' motions are now ripe for adjudication.

## II.  DEFENDANT'S MOTION TO DISMISS

As a threshold matter, defendant moves to dismiss NGS's challenge to the Jurisdiction 8 solicitation on justiciability grounds.[8]  Specifically, defendant contends that NGS lacks standing

---

[8]  Defendant seeks dismissal pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), which concerns subject matter jurisdiction.  However, the court's inquiry into the justiciability of a case is distinct from its inquiry into whether it has jurisdiction over the case's subject matter.  Powell v. McCormack, 395 U.S. 486, 512 (1969); Baker v. Carr, 369 U.S. 186, 198 (1962); Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1335 n.3 (Fed. Cir. 2008); Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993); see also Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999) (describing subject matter jurisdiction as a court's "general power to adjudicate in specific areas of substantive law").  In other words, the court may find that it possesses jurisdiction over the subject matter of a case but that the dispute is nevertheless nonjusticiable.

In such situations, the court should dismiss the case as nonjusticiable and not for lack of subject matter jurisdiction.  See, e.g., Baker, 369 U.S. at 196 (holding that a case that is "unsuited to judicial inquiry or adjustment" should be dismissed for "a failure to state a justiciable cause of action" and not for "a lack of jurisdiction of the subject matter" (internal quotation marks omitted)); Oryszak v. Sullivan, 576 F.3d 522, 526-27 (D.C. Cir. 2009)

to protest CMS's inclusion of the Contract Award Limitations policy in the Jurisdiction 8 solicitation because the policy's inclusion "does not actually or imminently threaten NGS's chances of receiving the [Jurisdiction 8] contract award."[9]  Def.'s Cross-Mot. 17.  Defendant

---

(Ginsburg, J., concurring) (emphasizing that "it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction"); see also Kontrick v. Ryan, 540 U.S. 443, 455 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' . . . only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").

Defendant does not contest the court's jurisdiction to entertain the subject matter of this bid protest.  Under the Tucker Act, the United States Court of Federal Claims ("Court of Federal Claims")

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2012).  As noted above, NGS's amended complaint contains challenges to the Contract Award Limitations policy that is included within the Jurisdiction 8 and Jurisdiction H solicitations; specifically, NGS alleges that the policy contravenes the CICA by impermissibly restricting "full and open competition."  See Am. Compl. ¶¶ 2-4, 84, Prayer for Relief.  NGS reiterates this challenge in its motion for judgment on the administrative record, Pl.'s Mot. J. Administrative R. ("NGS Mot.") 14, and in its reply in support of its motion and response to defendant's motion to dismiss in part and cross-motion for judgment on the administrative record, Pl.'s Reply Supp. Mot. J. Administrative R. & Resp. Def.'s Cross-Mot. ("NGS Opp'n") 5.  In other words, NGS is challenging, at a minimum, a purported "violation of statute or regulation in connection with a procurement or proposed procurement."  It is well established that a "non-frivolous allegation" of such a violation "is sufficient to establish jurisdiction" in the Court of Federal Claims.  Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008).  While defendant contests the merits of NGS's amended complaint and its motion for judgment on the administrative record, defendant does not contend that any of the positions advanced therein are frivolous.  Further, the court has no reason to believe that NGS's arguments are maintained in other than good faith.  Accordingly, the court possesses subject matter jurisdiction to entertain this protest.

[9]  Defendant also seeks dismissal of NGS's challenge to the Contract Award Limitations policy to the extent that NGS seeks to challenge the policy generally, "untethered to any particular procurement."  Def.'s Cross-Mot. 17.  Defendant's contention that NGS seeks to challenge the policy generally is based on NGS's request that the court "enjoin CMS'[s] application of the Policy going forward on the [Jurisdiction 8], [Jurisdiction H], or any other

does not contest NGS's standing to pursue its challenge to the Jurisdiction H solicitation.  See id. at 3 n.2 ("We do not contest the Court's jurisdiction to entertain NGS's challenge to the award limitation provision in the [Jurisdiction H] solicitation."), 48 ("NGS's belief that the award limitation provisions might negatively affect its chances of award is speculative with regard to any pending procurement other than [Jurisdiction H].").

Standing is an aspect of the case-or-controversy requirement outlined in Article III, Section 2 of the United States Constitution.[10]  Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997).  In a standing inquiry, the court examines "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  Without standing, a litigant's dispute is not justiciable.  Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (panel portion) (noting that justiciability "encompasses a number of doctrines under which courts will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness, and political question").

In bid protests, standing "is limited to actual or prospective offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract."  Weeks Marine, 575 F.3d at 1359.  In other words, a protestor must show that it "(1) is an actual or prospective bidder and (2) possesses the requisite direct economic interest" to establish standing.  Id. (internal quotation marks and alterations omitted).  The standing requirements to maintain a bid protest under 28 U.S.C. § 1491(b)(1) are "more stringent" than the typical Article III standing requirements.  Id.

In the instant protest, defendant does not allege that NGS is not an actual or prospective offeror with respect to the Jurisdiction 8 solicitation.  Indeed, NGS averred, in its GAO protest, that it planned to submit a proposal in response to the solicitation, and it had done so by the time its complaint was filed in this court.[11]  Therefore, to resolve defendant's motion to dismiss, the court must determine whether NGS has the necessary "requisite direct economic interest" in the

procurement."  NGS Mot. 38 (emphasis added).  However, given NGS's clarification that it seeks "[p]ermanent injunctive relief preventing CMS from continuing the workload caps set forth in the [Jurisdiction 8] and [Jurisdiction H] solicitations," NGS Opp'n 24, it is apparent that NGS is not mounting a challenge to the Contract Award Limitations policy generally.  Therefore, to the extent that defendant seeks dismissal of NGS's challenge to CMS's Contract Award Limitations policy generally, rather than specifically with respect to the Jurisdiction 8 and Jurisdiction H solicitations, defendant's motion must be denied as moot.

[10]  Defendant correctly observes that although the Court of Federal Claims is an Article I court, it "applies the same standing requirements enforced by other federal courts created under Article III."  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (internal quotation marks omitted).

[11]  With respect to the Jurisdiction H solicitation, NGS avers, and defendant does not contest, that NGS is a "prospective bidder."  Am. Compl. ¶ 17.  Proposals in response to the Jurisdiction H solicitation are not due until May 1, 2018.

outcome of the Jurisdiction 8 procurement.  See, e.g., Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

In a pre-award bid protest challenging the terms of the solicitation, such as the instant protest, a direct economic interest is established "by alleging a non-trivial competitive injury which can be redressed by judicial relief." Weeks Marine, 575 F.3d at 1363; see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 696-97 (2010) (distinguishing between the "allegational prejudice" necessary to establish standing and the "prejudicial error" necessary for success on the merits, and noting that success in demonstrating the former does not guarantee success in demonstrating the latter).  A "lost opportunity to compete for a contract on a level playing field" can constitute such a competitive injury.  Sys. Application & Techs., 691 F.3d at 1383.  However, allegations amounting to "mere speculation" are insufficient to establish standing in a pre-award bid protest, SOS Int'l LLC v. United States, 127 Fed. Cl. 576, 588 (2016), as are allegations that are "purely conjectural," Boston Harbor Dev. Partners, LLC v. United States, 103 Fed. Cl. 499, 504 (2012).

NGS asserts that it has a "direct economic interest affected by the terms of the Solicitations" because it cannot be awarded the A/B MAC contracts for both Jurisdiction F and Jurisdiction 8—or for Jurisdiction H at all—due to the Contract Award Limitations policy contained in each solicitation.  NGS Mot. 12.  NGS remarks that "because the Policy was included as a term of the [Jurisdiction 8] solicitation, [it] was required to bring its initial protest at the GAO prior to the submission of its proposal." Id. at 12-13 (relying on Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1315 (Fed. Cir. 2007)).  NGS posits that if it had not challenged the policy in the Jurisdiction 8 solicitation when it did, it "would have been unable to challenge the Policy as incorporated into the [Jurisdiction 8] Solicitation at all." Id. at 13.

Defendant avers that the Blue & Gold Fleet waiver rule "does not compel the conclusion that NGS has standing to challenge the award limitation clause in the [Jurisdiction 8] procurement" because, according to defendant, if NGS lacks standing to challenge the policy, then it does not have an "opportunity to object" to a patent error in the solicitation.  Def.'s Cross-Mot. 20-21 (relying on Weeks Marine, 575 F.3d at 1374 n.2 (Dyk, J., dissenting)).  Defendant remarks that NGS faces a potential "non-trivial competitive injury" with respect to the Jurisdiction 8 solicitation only if NGS is first awarded the Jurisdiction F contract because, absent the Jurisdiction F award, NGS is eligible to be awarded the Jurisdiction 8 contract notwithstanding the Contract Award Limitations policy.  Id. at 19.

Blue & Gold Fleet teaches that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a [bid protest] in the Court of Federal Claims." 492 F.3d at 1315.  In the instant protest, NGS does not allege that CMS has improperly applied the Contract Award Limitations policy.  Rather, NGS is challenging the term itself.  Had NGS failed to raise its objections prior to submitting a bid, it would have been barred from later doing so.

In <u>Weeks Marine</u>, decided after <u>Blue & Gold Fleet</u>, the protestor challenged the terms of a solicitation that invited sealed bids for task orders.  575 F.3d at 1362.  The protestor was one of only a handful of contractors capable of performing a significant portion of the underlying contract and "expressed an interest in bidding, sent in complaints and concerns, noted its contracting ability, and suggested that it would likely receive a substantial percentage of the [task orders] in sealed bidding."  <u>Id.</u>  In finding that the protestor had standing to pursue its pre-award challenge to the solicitation, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") observed that the protestor "ha[d] a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations" because, if allowed to go forward, the solicitation would "dictate [the protestor's] bidding and government work in the South Atlantic Division for the next five years."  <u>Id.</u>

In the instant case, NGS is similar to the protestor in <u>Weeks Marine</u>:  it is interested in and capable of performing the contract, it lodged complaints and concerns with the agency directly, and is in a position where operation of the challenged policy has a reasonable likelihood of impacting its business over the next several years.  As the current MAC for Jurisdictions 6 and K, NGS is responsible for 19.8% of the national A/B MAC workload and has demonstrated its capability of winning and successfully administering A/B MAC contracts in both large and small jurisdictions.  Moreover, NGS is one of [. . .] offerors with respect to the Jurisdiction F solicitation.  Thus, under the facts as alleged by NGS, the possibility that NGS will be awarded the Jurisdiction F contract—thereby increasing its share of the national A/B MAC workload to 26.0% and thus, by application of the supposedly <u>ultra vires</u> Contract Award Limitations policy, foreclosing NGS's ability to be awarded the Jurisdiction 8 contract—goes beyond mere speculation, conjecture, or hypothesis.  Due to the size (5.9% of the national A/B MAC workload) and duration (up to seven years) of the Jurisdiction 8 contract, the alleged potential competitive injury to NGS is certainly not trivial.  Further, to the extent that NGS may suffer competitive injury due to application of the Contract Award Limitations policy, such injury can be averted by a judicial ruling in NGS's favor on the merits of its protest.  Therefore, NGS has a "definite economic stake" in the procurement being properly executed.

In <u>Weeks Marine</u>, the Federal Circuit emphasized that when (as alleged here by NGS) there is a facial defect in a solicitation, "a bidder should not have to wait until the solicitation is applied unfavorably to establish injury."  575 F.3d at 1363.  The Federal Circuit remarked that requiring a bidder to do so would produce an "anomalous" result because the bidder would be prevented from raising a pre-award protest to challenge the allegedly defective term on standing grounds and then later prevented from challenging that same term in a post-award protest due to the <u>Blue & Gold Fleet</u> waiver rule.  <u>Id.</u>  This is the exact situation facing NGS.  Defendant's averment that NGS would not fall victim to the waiver rule if it did not have standing to object earlier is unavailing.

Defendant's reliance on <u>Clapper v. Amnesty International USA</u> is similarly meritless.  In <u>Clapper</u>, the United States Supreme Court ("Supreme Court") declared that an alleged injury for standing purposes must be "<u>certainly impending</u> to constitute injury in fact and that allegations of <u>possible</u> future injury are not sufficient," and posited that applying an "objectively reasonable likelihood standard" was insufficient to confer standing.  568 U.S. 398, 409-10 (2013) (internal

quotation marks and alterations omitted).  However, as NGS remarks, Clapper is "easily distinguishable," NGS Opp'n 22, from the instant protest.

In Clapper, the Supreme Court was tasked with deciding whether certain United States persons had standing to challenge the ability of the federal government to engage in surveillance of non-United States persons.  568 U.S. at 401.  The Clapper Court specified that the standing inquiry must be "especially rigorous when reaching the merits of the dispute would force [the reviewing court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  Id. at 408.  There are no such constitutional concerns in the instant protest.  Thus, the competitive injury that NGS potentially faces is wholly different than the nature of the injury alleged in Clapper.

Further, in determining that the respondents lacked standing, the Clapper Court emphasized that the respondents had, at best, a "highly speculative fear" based on a "highly attenuated chain of possibilities" comprised of a series of five discrete events, each of which was very hypothetical on its own.  Id. at 410.  The Clapper Court opined that the respondents could not have established standing even under a "substantial risk standard . . . in light of the attenuated chain of inferences . . . involving unfettered choices made by independent actors not before the court."  Id. at 414 n.5 (internal quotation marks omitted).  Here, although NGS relies on a hypothetical event to establish standing, there is only one such event—being awarded the Jurisdiction F contract—and that event is neither highly speculative nor concerned with actors not before the court.[12]

In any event, the Supreme Court later clarified that "[a]n allegation of future injury may suffice [to establish standing] if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur."  Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (emphasis added) (quoting Clapper, 568 U.S. at 409, 414 n.5).  As explained above, NGS has alleged, at a minimum, a substantial risk of nontrivial competitive injury for which it can obtain redress via a favorable ruling from this court.

---

[12]  It is undisputed that being awarded the Jurisdiction H contract (which comprises 13.5% of the national workload) would put NGS over the contract award limit because NGS is currently responsible for 19.8% of the national A/B MAC workload.  Accordingly, defendant concedes that NGS has standing to pursue its pre-award challenge to the Contract Award Limitations policy contained in the Jurisdiction H solicitation.

It is also undisputed that, if NGS was awarded the Jurisdiction F contract, NGS would then be responsible for 26.0% of the national workload and any subsequent awards to NGS— e.g., Jurisdiction 8 or Jurisdiction H—would similarly put NGS over the contract award limit. Thus, defendant impliedly concedes, and cannot plausibly argue otherwise, that there would no question concerning NGS's standing to pursue its pre-award challenge to the terms of the Jurisdiction 8 solicitation if NGS is awarded the Jurisdiction F contract for which it is currently competing.

In short, NGS has standing to pursue its challenge to the Contract Award Limitations policy contained within the Jurisdiction 8 solicitation.  The court now turns to the merits of NGS's protest.

## III.  THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

NGS's overarching argument is that the Contract Award Limitations policy contained within the Jurisdiction 8 and Jurisdiction H solicitations impermissibly restricts competition for A/B MAC contracts.  Defendant avers that the policy does not restrict competition, but to the extent that it does, CMS has the statutory authority to implement the policy.  Defendant also contends that the Contract Award Limitations policy was rationally implemented and does not result in impermissible disparate treatment among competitors.

### A.  Standard of Review

In bid protests, the Court of Federal Claims reviews the procuring agency's action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Although Section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004); accord Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016).  Under this standard, the court

> may set aside a procurement action if (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.  A court reviews a challenge brought on the first ground to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations and internal quotation marks omitted); see also Turner Constr. Co. v. United States, 645 F.3d 1377, 1384-85 (Fed. Cir. 2011) (explaining that reviewing courts conduct a "rational basis" review of the agency action at issue, rather than an "independent de novo assessment"); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (observing that the "arbitrary and capricious" standard is "highly deferential" and requires courts to sustain agency actions that demonstrate "rational reasoning and consideration of relevant factors").  Generally, "the focal point for judicial review should be the administrative record already in existence, not

some new record made initially in the reviewing court."[13]  Camp, 411 U.S. at 142; accord Axiom
Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

### B.  The Contract Award Limitations Policy Does Not Restrict "Full and Open Competition"

The CICA generally requires federal agencies to "provide for full and open competition
through use of the competitive procedure(s) . . . that are best suited to the circumstances of the
contract action and consistent with the need to fulfill the Government's requirements
efficiently."  FAR 6.101(b).  Under the CICA, a procurement provides for "full and open
competition" when "all responsible sources are permitted to submit sealed bids or competitive
proposals."  41 U.S.C. § 107; accord FAR 2.101 ("Full and open competition, when used with
respect to a contract action, means that all responsible sources are permitted to compete.").  In
other words, a procurement that provides for "full and open competition" is one in which "the
procuring agency will not exclude any responsible source capable of meeting its needs from
bidding."  Fire-Trol Holdings, LLC v. United States, 66 Fed. Cl. 36, 41 (2005).  However, there
can be a lack of "full and open competition" when one party has a "significant competitive
advantage."  Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 443 (2015).

The purpose of requiring "full and open competition" is to "ensure[] that contracting
officers receive bids at competitively low prices."  Krygoski Constr. Co. v. United States, 94
F.3d 1537, 1543 (Fed. Cir. 1996).  For example, when "the contract as modified materially
departs from the scope of the original procurement," the modification constitutes a cardinal
change and "falls within CICA's competition requirement," allowing the contracting officer to
terminate the contract for convenience so that the additional work can be procured through "full
and open competition."  Id. at 1545.  Similarly, a delivery order that is beyond the scope of the
underlying contract violates the CICA's "full and open competition" mandate unless there is a
valid determination that the additional work involved may be procured on a sole-source basis or
with limited competition.  Cal. Indus. Facilities Res., Inc. v. United States, 104 Fed. Cl. 589, 595
(2012).

The Contract Award Limitations policy that NGS challenges does not prevent any
potential offerors from submitting bids.  Rather, the policy explicitly states that "CMS is placing
no limitation on the number of A/B MAC prime contracts for which any entity, or entities, may
submit proposals."  AR 133, 5546.  Therefore, because no offerors are prevented from
submitting proposals in response to the Jurisdiction 8 and Jurisdiction H solicitations—unlike,
for example, if either solicitation had been designated as a small business set-aside pursuant to

---

[13]  An administrative record typically contains the materials developed and considered by
an agency in making a decision subject to judicial review.  See Camp v. Pitts, 411 U.S. 138, 142-
43 (1973) (remarking that an agency's finding must be "sustainable on the administrative record
made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37
Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials
that were before the agency when it made its final decision.").

41 U.S.C. § 3303(b)—the solicitations do not run afoul of the CICA's "full and open competition" mandate.

NGS's argument that the ability to submit proposals is "meaningless" for offerors "bumping against the workload limits," NGS Mot. 14-15, is unavailing. For instance, an offeror that is the incumbent MAC in another jurisdiction will not have its full "Medicare workload value" counted against it if "CMS can definitively establish that the [offeror] will not be under contract for the follow-on or successor A/B MAC contract" in such other jurisdiction. AR 134-35, 5547. More importantly, that a particular offeror (such as NGS) may be prevented from receiving an award simply because it already has a certain share of the national A/B MAC workload does not equate to the offeror's proposal not being considered in good faith. To be sure, if the ability to submit proposals was truly meaningless because the proposals would not receive due consideration, then NGS's position would potentially have merit. However, CMS considers all proposals and does not apply the limitation until the time of award. In other words, CMS first determines which proposal offers the best value to the government, and then determines whether the workload cap would be exceeded. See id. at 134, 5547.

Even when an offeror would otherwise exceed the workload cap, CMS maintains the discretion to award the contract to that offeror if necessary "to ensure continuity in Medicare Fee-for-Service operations." Id. at 135, 5548. Here, "continuity" refers to the uninterrupted continuation of the A/B MAC workload itself, not to maintaining the incumbent contractor.[14] Indeed, the "Continuity of Services" clause contained within the Jurisdiction 8 and Jurisdiction H solicitations (1) specifies that "the services under this contract are vital to the Government and must be continued without interruption and that, upon contract expiration, a successor, either the Government or another contractor, may continue them," and (2) contains provisions regarding phasing in a new contractor. FAR 52.237-3 (emphasis added). CMS provided two examples of circumstances in which the exception could apply:

> [T]he [continuity] exception could be triggered if only one offeror were to respond to the RFP, and that single offeror would otherwise not qualify for an additional A/B MAC prime contract award under the policy. Similarly, the exception could apply if there were multiple offerors, but CMS found them all (save for one) to be non-responsible.

AR 4860. In those situations, operations would be disrupted if CMS did not allow an otherwise qualified contractor to exceed the workload caps. Thus, because each offeror that submits a proposal is considered in good faith for potential award, the Contract Award Limitations policy does not (contrary to NGS's assertion) "effectively create[] a partial set-aside for less-qualified offerors." NGS Mot. 14.

---

[14] Neither incumbent contractor in the Jurisdiction 8 and Jurisdiction H solicitations currently exceed the national A/B MAC workload cap. Therefore, to the extent that the Contract Award Limitations policy favors incumbents (which it does not), it is irrelevant to the instant protest.

In short, the Contract Award Limitations policy contained within the Jurisdiction 8 and Jurisdiction H solicitations does not restrict "full and open competition."  Any responsible offeror, including MACs that would exceed the workload cap, may submit a proposal in response to either solicitation and receive good-faith consideration for the award.

**C.  CMS Has the Statutory Authority to Implement the Contract Award Limitations Policy**

To the extent that the Contract Award Limitations policy restricts "full and open competition," CMS nevertheless has the statutory authority to implement the policy.  The parties agree that a "specific requirement" of Section 1874A of the Social Security Act or an express statutory authorization can permit CMS to employ other than full and open competition.  See 41 U.S.C. § 3301(a); 42 U.S.C. § 1395kk-1(a)(6).  Defendant highlights two statutory authorizations that it contends provide CMS with the authority to implement the policy:  Sections 1874A(a)(2)(D) and 1874A(b)(2) of the Social Security Act.

Section 1874A(a)(2) provides:

> An entity is eligible to enter into a contract with respect to the performance of a particular contract function [of an A/B MAC contract] only if—
>
> (A)  the entity has demonstrated capability to carry out such function;
>
> (B)  the entity complies with such conflict of interest standards as are generally applicable to Federal acquisition and procurement;
>
> (C)  the entity has sufficient assets to financially support the performance of such function; and
>
> (D)  the entity meets such other requirements as [CMS] may impose.

42 U.S.C. § 1395kk-1(a)(2) (emphasis added).

Section 1874A(b)(2) of the Social Security Act provides:

> No [A/B MAC contract] shall be entered into with any . . . contractor unless [CMS] find that such [MAC] will perform its obligations under the contract efficiently and effectively and will meet such requirements as to financial responsibility, legal

-27-

authority, quality of services provided, and <u>other matters as [CMS]
finds pertinent</u>.

<u>Id.</u> § 1395kk-1(b)(2) (emphasis added).

NGS characterizes the provisions upon which defendant relies as "broad, catchall
language" that would allow for "no limit to the types of competitive restrictions [CMS] could
impose upon MAC procurements." NGS Mot. 19. NGS contends that <u>ejusdem generis</u>—the
proposition that "where an enumeration of specific things is followed by a general word or
phrase, the general word or phrase is held to refer to things of the same kind as those specified,"
<u>Nielson v. Shinseki</u>, 607 F.3d 802, 807 (Fed. Cir. 2010) (internal quotation marks omitted)—
supports its position. Although NGS correctly states the law, NGS misses the mark in its
application.

The court agrees with the parties' framings of Section 1874A(a)(2) as an eligibility
provision and Section 1874A(b)(2) as a capability provision. Given that characterization, CMS
is specifically authorized to

- impose "other requirements" with respect to eligibility for an
  A/B MAC contract beyond capability, conflict of interest, and
  financial soundness, <u>see</u> 42 U.S.C. § 1395kk-1(a)(2); and

- decline to award an A/B MAC contract to a potential contractor
  that does not meet requirements concerning "pertinent" matters
  regarding capability beyond financial responsibility, legal
  authority, and quality of services provided, <u>see id.</u> § 1395kk-
  1(b)(2).

A criteria that is designed to "manage program risk associated with an entity (or, a set of
affiliated entities) taking on more program responsibility than can be reasonably managed by the
entity (or set of affiliated entities)," AR 1474, fits squarely within these two authorizations. An
entity, or set of affiliates, having too much work than it can reasonably manage certainly calls
into question that entity's capability to successfully perform the contract. The potential of being
overloaded is also inextricably tied to financial wherewithal and the quality of services that
would be provided. The workload caps were specifically implemented to mitigate such risks.
Further, concerns with respect to the capability of an entity, or set of affiliates, to successfully
perform fit squarely within the enumerated eligibility requirements. Examining whether a
potential awardee would have too much work is also not unlike the other eligibility standards
that are evaluated once a particular contractor becomes a putative awardee.

In any event, Section 1874A itself does not impose a requirement that CMS employ
"full and open competition" in A/B MAC procurements, but instead merely requires that CMS
"use <u>competitive procedures</u> when entering into [A/B MAC contracts], taking into account
performance quality as well as price and other factors." 42 U.S.C. § 1395kk-1(b)(1)(A)
(emphasis added). A "competitive basis" procurement is distinct from a "full and open

competition" procurement.  Res-Care, Inc. v. United States, 753 F.3d 1384, 1388 (Fed. Cir. 2013).  Small business set-asides, for example, exclude entire classes of potential offerors but are nevertheless competitive procurements if properly conducted.  Id.  Potentially excluding a single contractor (after a good-faith evaluation of all of the proposals received) that would have too much of the national A/B MAC workload does not render either the Jurisdiction 8 or Jurisdiction H procurement noncompetitive.

To that end, CMS is permitted to use "competitive procedures but excluding a particular source" if it determines that doing so would "increase or maintain competition and likely result in reduced overall cost for the procurement, or for an anticipated procurement" or to "ensure the continuous availability of a reliable source or supply of the property or service."  41 U.S.C. § 3303(a)(1)(A), (D).  In other words, CMS can exclude a particular source—i.e., a potential successful offeror—from an A/B MAC competitive procurement to increase competition for A/B MAC services or to ensure that there will be a sufficient number of capable A/B MAC contractors.  The Contract Award Limitations policy is designed to achieve both results by preventing CMS's overreliance on one or a handful of contractors.  CMS cannot make such a determination on a "class" basis, id. § 3303(a)(2), but the policy is only applied when there is a specific determination that the apparent successful offeror in a particular procurement would exceed the workload caps—it does not apply to a class of contracts or a class of contractors generally.  The policy does not even apply to a particular contractor generally (because the workload percentages can change over time).  That there are no general (i.e., "class") applications of the policy is even more apparent in light of CMS's discretion to not apply the policy if nonapplication is necessary to ensure continuity of services.  Further, when there is such an individual determination to exclude a particular source from a competitive procurement to increase or maintain competition or to ensure a continuous supply of services, the justification and approval procedures outlined in 41 U.S.C. § 3304(e)(1) for noncompetitive procurements do not apply.  Id. § 3303(c).

In short, CMS has ample statutory authority for including the Contract Award Limitations policy in the Jurisdiction 8 and Jurisdiction H solicitations.

### D.  The Contract Award Limitations Policy Is Not Irrational

Having determined that CMS has the authority to implement the Contract Award Limitations policy, the court must consider whether CMS acted rationally in doing so.  NGS argues that CMS "has failed to provide any rational basis, much less a legitimate need, for" implementing the policy.  NGS Mot. 20.  Defendant counters that "[t]he workload caps generally, and the specific percentages applied, rationally address CMS's reasonable concerns regarding maintaining a dynamic competitive marketplace and ensuring that Medicare claims operations will not be interrupted if a MAC suffers a business failure or disaster event."  Def.'s Cross-Mot. 30.

The court finds NGS's argument unpersuasive.  As noted above, an agency's decision must be sustained under the "highly deferential" rational basis standard of review if the decision "evince[es] rational reasoning and consideration of relevant factors."  Advanced Data Concepts,

216 F.3d at 1058.  Contrary to NGS's assertion that there is "no contemporaneous record evidence in support [of] the imposition of the workload caps," NGS Mot. 21, the administrative record reflects that CMS's decision to implement the Contract Award Limitations policy was not irrational.  CMS properly considered relevant factors in deciding to impose a workload limit and to set the caps at 26% for single entities and 40% for sets of affiliated entities.

The evidence in the administrative record shows that CMS was concerned with the potential problems associated with overreliance on too few contractors before it even began implementing the Medicare Modernization Act.  In May 2004, LMI issued a report commissioned by CMS in which it declared that (1) the impact of a failure of one contractor on Medicare beneficiaries and providers increased as the market share of that contractor increased and (2) limiting the number of contracts that could be awarded to a particular entity would not stifle competition.  Accordingly, LMI recommended that a particular contractor should not be allowed to win more than two A/B MAC contracts.  CMS's Medicare Contractor Management Group then recommended that CMS allow offerors to bid on an unlimited number of potential contracts, but that offerors should be restricted to receiving only 25% of the national A/B MAC workload.

Although it did not initially adopt LMI's recommendation, CMS revisited the recommendation as it prepared for Round II A/B MAC procurements beginning in 2010.  In the July 22, 2010 RFI, CMS explained that it intended to limit the prime contracts awarded to any particular contractor to 26% of the national A/B MAC workload to minimize program risk while still maintaining competition.  CMS tied the 26% figure to the number of contracts that could be awarded to a particular prime contractor.  Responses to the RFI generally supported CMS's proposed imposition of the 26% cap and suggested applying a limit to sets of affiliated entities.  CMS then weighed the benefits and drawbacks of three options:  (1) continuing with a case-by-case approach, (2) imposing a contract award limitation on prime contractors only, and (3) applying the contract award limitation to major subcontractors as well as prime contractors.  At the same time, CMS noted concerns regarding how to treat sets of affiliated entities.

CMS then updated its proposed Contract Award Limitations policy and, on August 24, 2010, issued another RFI in which it proposed to implement a policy—for the purpose of managing risk—in which single entities would be limited to being awarded 26% of the national A/B MAC workload, sets of affiliated entities would be subject to a 40% cap, and the caps would apply to both prime contracts and significant subcontracts.  Responses to the RFI generally supported a 26% cap as applied to single entities as a means of ensuring market competitiveness and mitigating risk to CMS, while responses varied with respect to applying the cap to sets of affiliates.  The responses tended to favor applying a cap to sets of affiliates but suggested both lower and higher caps than the 40% figure that CMS proposed.  CMS decided to implement its proposed policy after removing references to subcontracts.

Approximately five years later, in September 2015, CMS issued another RFI to determine whether its policy remained appropriate given certain legislative updates to the A/B MAC program.  Respondents tended to favor continued use of the same 26% and 40% caps, emphasizing that (1) the caps were relatively generous and necessary to promote competition,

(2) higher caps could further reduce MAC competitiveness by imposing a greater barrier to entry into the A/B MAC market by nonincumbent contractors, and (3) having fewer potential contractors would increase the risk to CMS. Thus, industry consensus supported the continued use of the caps as a way to manage risk and promote competitiveness. After issuing an additional RFI in October 2016, CMS received comments indicating that increasing the caps (or lifting them altogether) would eventually shrink the contractor pool, which would benefit CMS by simplifying its administrative oversight burden but also increase the risk to continuity of services. CMS then decided that, despite the benefit of a reduced burden with respect to administrative oversight of the A/B MAC program that a smaller contractor pool would generate, mitigating risk and maintaining competition were of greater weight. Consequently, CMS continued to include the Contract Award Limitations policy in its procurements for A/B MAC contracts.

In sum, CMS repeatedly explained, in its RFIs and internal documents, that it was concerned with both mitigating program risk and promoting competition and, further, that it viewed the workload caps as the best strategy to achieve these two goals. Importantly, the administrative record reflects that the vast majority of MACs agreed that imposing the workload caps was necessary to achieve these two goals and expressed that the failure to impose such caps would be detrimental to the A/B MAC program. The administrative record also reflects that CMS first proposed applying a contract award limitation to sets of affiliates after a majority of respondents to its first RFI (including NGS) advocated for doing so. Further, the administrative record shows that, in formulating the Contract Award Limitations policy, CMS considered how many contracts could be awarded. In any event, the details of how the workload caps were derived is irrelevant because the figures ultimately reflect CMS's business judgment and, notably, CMS sought and incorporated feedback with respect to its proposed Contract Award Limitations policy multiple times both prior and subsequent to the policy's implementation. In other words, in considering how to mitigate risk and promote competition, CMS commissioned studies, reviewed myriad comments from industry stakeholders in response to multiple RFIs over several years, and internally debated the merits of various approaches.

This protest is similar to CHE Consulting, Inc. v. United States. In CHE Consulting, the protestor challenged an agency decision to bundle hardware and software maintenance services into one solicitation. 552 F.3d 1351, 1353 (Fed. Cir. 2008). The Federal Circuit declared that the agency had contemporaneously established a rational basis to combine the services into one contract despite the sparse evidence in the administrative record.[15] Id. at 1354. The Federal Circuit (1) highlighted a memorandum "that expressed concern that segregating the contracts would present unacceptable risks to mission-critical equipment," (2) observed that the record demonstrated that any service disruption would have "adverse effects throughout the agency," and (3) emphasized that an affidavit provided both detailed information concerning the agency's mission critical operations and a statement indicating that "[a]lthough a segregated maintenance

_____

[15] The Federal Circuit noted that the trial court had requested supplementation of the administrative record. CHE Consulting, 552 F.3d at 1353-54. However, the Federal Circuit remarked that supplementation was unnecessary because the agency "had established a rational basis" for its decision "before the trial court requested supplementation." Id. at 1354.

solution would be theoretically possible, and could potentially result in a cost savings to the government, . . . such a solution would incur a risk to [the agency] that the government is not willing to accept." Id. at 1354-55 (internal quotation marks and alterations omitted).

Similar to CHE Consulting, in the instant protest, there are multiple documents contained within the administrative record that describe both (1) how and why CMS arrived at its decision to implement the Contract Award Limitations policy and (2) how that policy was to be implemented:

- LMI report issued in May 2004;

- CMS Medicare Contractor Management Group recommendation in November 2004;

- Responses to multiple RFIs, which were issued in July 2010, August 2010, September 2015, and August 2016;

- Internal CMS discussions in July and August 2010;

- Answers to questions posed in response to solicitations issued in October 2010 and August 2014.

Contrary to NGS's suggestion, there is extensive contemporaneous documentation in the administrative record describing CMS's "thought process" in devising and implementing its Contract Award Limitations policy.[16]  In fact, these documents are more numerous than the memorandum and affidavit that the Federal Circuit found sufficient in CHE Consulting. Moreover, in upholding the agency action in CHE Consulting, the Federal Circuit noted the importance to the agency of the services sought and distinguished a case where the agency's explanation was overturned as being "merely an 'unsubstantiated concern about an ill-defined problem of potentially very limited proportions.'" Id. at 1355.  In the instant protest, the parties do not dispute the importance or scope of the services that CMS seeks to procure in the Jurisdiction 8 and Jurisdiction H solicitations and, as explained above, CMS's concern with respect to overreliance on only a handful of contractors was well documented.

---

[16]  These documents are sufficient to support the court's conclusion that CMS's construction and implementation of the Contract Award Limitations policy was not irrational. Accordingly, the court need not rule on the propriety of the Klots Declaration contained within the administrative record because the declaration was neither necessary nor relied upon in rendering this decision.  This approach is similar to the Federal Circuit's remark that supplementation of the record was unnecessary in CHE Consulting because there was ample evidence already contained therein to support the court's conclusion.  See supra note 15.

NGS contends that "the workload caps appear to be a solution in search of a problem" and that "the risks CMS has identified are entirely hypothetical." NGS Mot. 22. To the extent that the risks identified by CMS are hypothetical, it is of no moment.

> Contrary to [the protestor's] arguments, [the agency] has no obligation to point to past experiences substantiating its concerns in order to survive rational basis review. . . . CICA imposes no obligation to supply a historical record of failures in order to substantiate a risk. Indeed[, agencies have] a responsibility to assess risks and avoid them before they become a historical fact. In terms of CICA, its policies of "full and open competition" also recognize that agencies have discretion to use competitive procedures that are "best suited under the circumstances of the procurement." In terms of this procurement, [the agency] need not suffer some maintenance failures in order to substantiate its assessment of risks or other potential "circumstances of the procurement."

CHE Consulting, 552 F.3d at 1355. In other words, agencies should seek to avoid risks before they happen, which is what CMS is attempting to do by implementing the Contract Award Limitations policy. Further, NGS's comment that "CMS has never identified anything in the contemporaneous record to suggest that a MAC contractor had requested a 'clear policy' in lieu of a case-by-case analysis," NGS Mot. 24, misses the mark for two reasons. First, it is irrelevant whether the idea for an explicit workload cap emanated from industry or within CMS.[17] Second, and more importantly, the administrative record contains internal CMS electronic-mail messages from July and August 2010 in which officials discuss the tradeoffs between continuing with the case-by-case approach and implementing a bright-line limitation.

Those internal messages included discussion of how to address affiliates, which was mentioned by a majority of respondents, including NGS, to the July 22, 2010 RFI. The comments received and internal discussions afterwards resulted in CMS revising its proposed Contract Award Limitations policy to include a 40% workload cap for sets of affiliates; the revised proposed policy was released to the public for the first time in the August 24, 2010 RFI. The Contract Award Limitations policy in the Jurisdiction 8 and Jurisdiction H solicitations both define "affiliate" by reference to FAR 9.403, which provides:

> Business concerns, organizations, or individuals are affiliates of each other if, directly or indirectly, (1) either one controls or has the power to control the other, or (2) a third party controls or has the power to control both. Indicia of control include, but are not limited to, interlocking management or ownership, identity of

---

[17] The first time a workload cap was mentioned was in the May 2004 LMI report, and the first time a specific figure for such a cap was mentioned was in the November 2004 recommendation from the CMS Medicare Contractor Management Group.

> interests among family members, shared facilities and equipment,
> common use of employees, or a business entity organized
> following the debarment, suspension, or proposed debarment of a
> contractor which has the same or similar management, ownership,
> or principal employees as the contractor that was debarred,
> suspended, or proposed for debarment.

FAR 9.403.  Thus, two entities with a common parent—such as Novitas and First Coast under the Guidewell Source umbrella or Palmetto and CGS under the Celerian Group umbrella—would qualify as affiliates, as would entities in a parent-subsidiary relationship.

NGS contends that the higher workload caps for sets of affiliated entities vis-à-vis single entities is unfair because "a single entity with direct control over two affiliates may compete for 40% of the MAC workload through those affiliates" while a "single entity without affiliates . . . is left to compete for only 26% of the MAC workload" despite "[t]hese two offerors [being] functionally equivalent to one another."  NGS Mot. 30.  NGS also posits that the higher cap for sets of affiliated entities is "a loophole that can easily be exploited by sets of affiliates."  Id.  Defendant emphasizes that "affiliates are separate legal entities, and CMS contracts with particular entities, not corporate families."  Def.'s Cross-Mot. 40.

NGS's declaration of equivalence between a parent entity with one or more subsidiaries and a single unaffiliated entity is meritless.  Contrary to what NGS would have the court believe, the distinction is indeed meaningful.  Even when two entities "exist[] independently . . . only on paper, the court is bound to treat [them] as separate entities."  Scott Timber Co. v. United States, 97 Fed. Cl. 685, 695 (2011), rev'd on other grounds, 692 F.3d 1365 (Fed. Cir. 2012).  "In issues of corporate law structure often matters. . . .  A basic tenet of American corporate law is that the corporation and its [parent] are distinct entities."  Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003).  The Supreme Court has observed that the "doctrine of piercing the corporate veil" between a corporation and its parent to disregard their separate existence "is the rare exception," and is typically applied only in fraud or "certain other exceptional circumstances."  Id. at 475.  Thus, it is rational for CMS not to treat entire sets of affiliates as one single entity, as NGS would have it do.  Such a treatment would only be proper if a particular entity was merely an alter ego of its affiliate, i.e., if their separate corporate identities was a sham.[18]

---

[18]  The alter ego theory is an "exception to the general rule that a subsidiary and the parent are separate entities."  Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001), abrogated on other grounds by Daimler AG v. Bauman, 134 S. Ct. 746 (2014).  In general, application of the theory requires two elements:  (1) "there is such unity of interest and ownership that the separate personalities of the two entities no longer exist"—i.e., when "the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former"—and (2) "failure to disregard their separate identities would result in fraud or injustice."  Id. (internal quotation marks and alterations omitted).  For instance, courts have applied the alter ego theory when a parent "dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation."  Id. at 926-27 (internal quotation marks and alterations omitted).

If there were a situation in which a potential awardee was the alter ego of an existing MAC, CMS would likely be able to identify such a relationship in the organizational information required to be submitted with each proposal. There is no reason to believe that CMS could not then simply treat the two entities as one for purposes of applying the Contract Award Limitations policy. In any event, there are no allegations that the two sets of affiliates among the current MACs throughout the nation involve any alter egos.

Further, NGS's concern regarding contractors setting up subsidiaries to game the system is overstated for two main reasons. First, CMS would be aware if a MAC was attempting to circumvent the workload caps by subcontracting on a proposal under consideration and/or through the use of a newly created entity. A new entity would not be able to secure an A/B MAC contract without teaming with an experienced contractor because each offeror must attest to having the necessary experience, either in its own right or through its subcontractors, and the organizational charts would apprise CMS of a significant subcontractor that was an existing MAC. Second, as acknowledged by NGS's chief operating officer, "operationaliz[ing] a new entity . . . require[s] a significant amount of time and expense" and is not a "simple" undertaking. AR 4664-65. Tellingly, NGS does not appear to have ever attempted to "game the system" by having its existing affiliate (NGS Federal) or a newly created entity bid as a prime contractor on an A/B MAC solicitation—demonstrating that doing so is neither an easy task nor likely to be successful.

In short, CMS rationally decided not to treat entire sets of affiliates as a single entity, and rationally imposed the 26% and 40% workload caps on single entities and sets of affiliates.

### E. Summary

The Contract Award Limitations policy does not restrict full and open competition. In any event, even if the policy restricted full and open competition, CMS had the statutory authority to implement the policy. Further, CMS had a rational basis for treating entire sets of affiliates differently than single entities, imposing a 26% cap on single entities, and imposing a 40% cap on sets of affiliated entities. In other words, CMS's decision to implement the Contract Award Limitations policy was neither contrary to law nor lacking a rational basis. Therefore, NGS has not prevailed on the merits of its protest.

### IV. INJUNCTIVE RELIEF

Having ruled on the merits of NGS's protest, the court turns to NGS's request for a permanent injunction preventing CMS from implementing the Contract Award Limitations policy in the Jurisdiction 8 and Jurisdiction H solicitations.

The Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by Rule 65 of the Rules of the United States Court of Federal Claims. In determining whether to award a permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships

favors granting injunctive relief, and (4) it is in the public interest to grant injunctive relief. Centech, 554 F.3d at 1037.  The protestor bears the burden of establishing the factors by a preponderance of the evidence.  Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 654 (2014); Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006).

Although an award of injunctive relief is based on the consideration of a four-factor test, failure to achieve success on the merits is dispositive.  See PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (explaining that a plaintiff "must [have] succeeded on the merits of the case" in order to be granted permanent injunctive relief); Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 219 (2008) ("[A] permanent injunction requires actual success on the merits." (collecting cases)).  Since NGS has not achieved success on the merits of its protest, it is not entitled to injunctive relief.  Thus, the court need not address the remaining factors or the scope of NGS's request.

## V.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or are unnecessary for resolving the matters currently before the court.

Although NGS has standing to pursue its challenge of the Contract Award Limitations policy included in the Jurisdiction 8 and Jurisdiction H solicitations, its challenge is unsuccessful.  The Contract Award Limitations policy does not restrict full and open competition, and CMS was statutorily authorized to implement the policy.  Further, CMS has provided a rational basis for implementing the policy, distinguishing between sets of affiliates and unaffiliated entities, and limiting single contractors and sets of affiliates to being awarded 26% and 40%, respectively, of the national A/B MAC workload unless applying the limitation would disrupt the continuity of services provided.  Because NGS has not succeeded on the merits of its protest, it is not entitled to a permanent injunction.

Therefore, the court **DENIES** defendant's motion to dismiss, **DENIES** NGS's motion for judgment on the administrative record, and **GRANTS** defendant's cross-motion for judgment on the administrative record.  No costs.  The clerk is directed to enter judgment accordingly.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **no later than Thursday, May 17, 2018**, the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge